BANK OF THE WEST, Plaintiff,

v.

VALLEY NATIONAL BANK OF
ARIZONA, Defendant.

No. C–89–2293–FMS–WDB.

United States District Court,
N.D. California.

Aug. 17, 1990.

Kenneth Kennedy, San Jose, Cal., John Pasco, and Kimberly Paul of Jackson, Tufts, Cole & Black, San Francisco, Cal., for plaintiff.

Michael Torpey, Manuel Martinez, and Bruce Ohr of Orrick, Herrington & Sutcliffe, San Francisco, Cal., for defendant.

## OPINION AND ORDER RE MOTION TO COMPEL PRODUCTION OF THE "BUCHALTER DOCUMENTS"

WAYNE D. BRAZIL, United States Magistrate.

### Introduction

The documents in issue here include memoranda, correspondence, notes and other materials that make up the files that a law firm, Buchalter, Nemer, Fields, Chrystie & Younger, developed while representing Bank of the West ("BOW") in litigation

arising out of the failure of Technical Equities Corporation ("TEC"). Defendant Valley National Bank ("VNB") began its efforts to compel disclosure of these documents (the "Buchalter documents") last fall by filing a motion to compel (many aspects of which related to documents and other discovery as to which disputes already have been resolved). The undersigned declined to rule on the motion until Judge Smith was given an opportunity to make·determinations fundamental to the shape of this case and the allocation at trial of burdens of proof. Judge Smith articulated these determinations in her Order Granting Partial Summary Judgment, filed April 13, 1990. Thereafter VNB noticed a hearing date before the undersigned on its renewed motion to compel for June 27, 1990. While entering rulings on that date with respect to many outstanding discovery disputes, the court postponed ruling on the status of the Buchalter documents in order to give counsel an opportunity to submit additional declarations and argument with respect to several issues that the court felt had not been fully explored in the papers that had been submitted up to that point. On July 13 and July 19/20, 1990, both parties submitted additional papers intended to be responsive to a lengthy list of issues articulated in writing by the undersigned in·an Order filed July 5, 1990. Thus the parties have had ample opportunity to present evidence and argument in support of their respective positions.

■ In this diversity action, California law governs resolution of issues arising out of plaintiff's invocation of the attorney-client privilege. Fed.R.Ev. 501. Work product issues are resolved under federal law. *Great American Surplus Lines, Inc. v. Ace Oil Co.*, 120 F.R.D. 533, 539 (E.D. Cal.1988); *Connolly Data Systems, Inc. v. Victor Technologies, Inc.*, 114 F.R.D. 89 (S.D.Cal.1987); *Railroad Salvage of Connecticut, Inc. v. Japan Freight Consolidators (U.S.A.), Inc.*, 97 F.R.D. 37 (E.D.N.Y. 1983).

For the reasons set forth below, the court has concluded that BOW has waived the protections of both the attorney-client privilege and the work-product doctrine with respect to the Buchalter documents.

### Attorney-client privilege

VNB has advanced several different theories in support of its effort to compel disclosure of documents which BOW seeks to protect under the attorney-client privilege. The court is not persuaded by either of the first two, i.e. the "joint clients" theory or the contention that BOW has waived its privilege by pressing a claim that is fundamentally inconsistent with its effort to preserve the confidentiality of these documents. For reasons set forth in detail below, however, the court has accepted VNB's third theory, i.e., that BOW has waived its attorney-client privilege by voluntarily disclosing a "significant part" of what otherwise would be protected communications about how to analyze, handle, and dispose of the TEC litigation.

### *The "Joint Clients" Theory*

■ First, VNB argues that under the allegations in BOW's complaint in this action VNB qualifies as a "joint client" with BOW in the TEC litigation. At the outset, we note that VNB does not squarely contend that it was in fact a "joint client" of the Buchalter firm in the TEC litigation. Rather, VNB appears to be making a more artful assertion that the allegations in BOW's complaint "portray VNB as a joint client of the Buchalter firm." Somewhat more specifically, VNB argues that "BOW's own complaint alleges that its defense of the TEC Litigation was undertaken in the common interest of BOW and VNB. Complaint para. 16, 22. These allegations fulfill the requirements of the joint-client exception to the attorney client privilege set forth in Cal.Evid.Code § 962." Memorandum of Points and Authorities in Support of Defendant Valley National Bank of Arizona's Motion to Compel Production of Documents, at 6 (October 25, 1989). The simple and sufficient response to this argument by VNB is that the allegations in BOW's complaint do not "fulfill the requirements of the joint-client exception." The fact that BOW undertook defense of the TEC litigation in the common interest

of BOW and VNB, by itself, cannot be sufficient to satisfy the requirements of the joint defense doctrine. A doctrine that boundless would give rise to countless penetrations of the attorney-client privilege: perhaps whenever a non-party stood to gain (or avoid a loss) by virtue of the success of a party to a lawsuit.

Rather than create such an open-ended and unpredictable predicate for invading the privilege, California courts sensibly have suggested that § 962 of the Evidence Code does not apply unless both of the persons or entities involved can be characterized in a meaningful sense as "clients" of the same attorney. See, e.g., *Glacier General Assurance Company v. Superior Court of Los Angeles County*, 95 Cal. App.3d 836, 157 Cal.Rptr. 435 (2nd Dist. 1979). Thus, this section of the Code applies when an insurance company, pursuant to an obligation arising from a policy it has issued, hires an attorney to represent one of its insureds. In that setting, California courts have held that both the insurance company and the insured are clients of the one lawyer, and that the lawyer's primary duty is to the insured. See *American Mutual Liability Ins. Co. v. Superior Court*, 38 Cal.App.3d 579, 113 Cal.Rptr. 561 (3rd Dist.1974).

In the case at bar, VNB does not assert that it was in fact a client of the Buchalter firm. Indeed, in February or March of 1987, well before settlement of the TEC litigation was consummated, VNB expressly denied that Buchalter represented it in that suit. (Zillman Declaration, July 20, 1990.) Moreover, VNB was separately represented throughout the entire period of the pendency of the TEC litigation by the law firm of Gust, Rosenfeld & Henderson; at least one member of that firm participated directly in most of the communications between Buchalter and VNB that were related to the TEC action. (Turnage Declaration, executed July 12, 1990.) We also point out that it would strain the court's credulity for VNB to suggest that it did not foresee, from even before the first TEC action was filed (TEC filed for bankruptcy before the first suit was filed against it), that there was a real possibility that BOW and VNB would end up on opposite sides in litigation arising out of the funding of TEC activities.

We note next that VNB also has adduced no evidence that would support a finding that BOW had a duty to defend VNB in the TEC litigation (where, incidentally, VNB was *not* named as a party). Since there is no language in the Participation Agreement that would impose any such duty on BOW, the analogy that VNB would have us draw between its situation and cases involving insurance contracts that impose clear duties to defend and indemnify seems quite strained, at best.

Finally, VNB has failed to persuade the court that it in fact exercised, jointly with BOW, the decision-making powers that clients commonly exercise in litigation. While it is clear that BOW's counsel passed along some information about the status of litigation matters to VNB and its counsel, and sought VNB's consent with respect to decisions that significantly affected litigation expenses or the disposition of the collateral that supported the underlying loan to TEC (Zillman Decl., July 20, 1990), VNB has not shown that it exercised anything like a "vote" (equal or otherwise) with respect to the kinds of strategic decisions that clients normally participate in making. Nor has VNB offered any competent evidence challenging the factual assertion in Mr. Zillman's declaration that "[t]hroughout the course of the Buchalter firm's representation of plaintiff in connection with the TEC Litigation, I and members of the executive office of plaintiff have made all of the 'client' decisions impacting that litigation." *Id.* Moreover, VNB has consistently complained that BOW and the Buchalter firm failed to keep it adequately informed about what was going on in the TEC cases. See, e.g., excerpts from the deposition of Wallace Turnage, quoted in BOW's Reply Memorandum, July 20, 1990, at 9–10, and the allegations in VNB's sixth counterclaim (filed December 29, 1988). Thus, rather than acting like it perceived itself as a "joint client" of the Buchalter firm, VNB appears to have understood from the outset that there was considera-

ble potential tension between its interests and those of BOW and to have taken great pains to guard those interests through the active involvement of its own separately retained counsel. This simply is not the kind of environment contemplated in Evidence Code § 962.

*Assertion that BOW Waived Privilege by Interjecting Issue of Relation Between Settlement Payments and the Loan*

■ The second predicate for its efforts to compel production of the Buchalter documents is VNB's contention that BOW has waived whatever attorney-client protection might have attached to these communications by insisting that the payments it made in settlement of the TEC litigation arose out of a "claim ... relating to the Loan" and thus qualified as "extraordinary expenses" under paragraph 6 of the Participation Agreement. In essence, VNB contends that BOW has made "key factual assertions that could be proved or disproved only by reference to information within the control of the plaintiff...." (VNB's Reply Memorandum, November 15, 1989, at 5). Somewhat more specifically, VNB takes the position that BOW can recover the full amounts it claims in this action only if it can prove that the settlement it paid and the attorneys fees it incurred in the TEC litigation were attributable only to claims relating to the loan that was the subject of the Participation Agreement and not, even in part, to claims arising out of conduct by BOW that was not related to that loan. In addition, VNB asserts that plaintiff's theory of the case necessarily requires it to introduce into evidence, as part of its case in chief, testimony from its lawyers about how they analyzed BOW's exposure in the TEC actions and what reasoning supported their recommendations to their client about terms of settlement.

There are several lines of response to these related contentions. First, in response to inquiry by the undersigned, BOW formally elected *not* to call "any present or former Buchalter attorney as a witness at the trial ... for purposes other than pro-

viding rebuttal testimony" or, if necessary, to authenticate documents. BOW's Supplemental Memorandum, July 13, 1990, at 2. Introduction (for any purpose) at trial of evidence from privileged communications would constitute a waiver of protections otherwise afforded and entitle VNB to discover all communications in the same subject area. As we make clear in the next section, the court cannot allow plaintiff to selectively disclose some privileged communications, or parts of them, while holding back others. If we had not concluded, as we have in the next section, that BOW has waived its privilege by virtue of disclosures it *already* has made, we would view BOW's elections to forego use of any such evidence *at trial* (except as necessary in rebuttal) as eliminating any imminent risk of selective use of privileged communications to gain an unfair litigation advantage. However, our conclusion that BOW's *past* disclosures constitute a waiver of its privilege means that VNB will have access to the Buchalter documents well before the trial of this matter. As a result, it would be unfair to hold BOW to the election it made as part of its effort to preserve the confidentiality of these documents. The undersigned, therefore, vacates BOW's election and recommends that it play no role in subsequent rulings about whether evidence from or about privileged communications may be introduced at trial.

VNB also contends that the nature of BOW's affirmative claim for relief, and the burdens of persuasion that that claim imposes, give rise to an independent ground for a finding of waiver, without regard to whether BOW introduces evidence from or about Buchalter communications that are protected by privilege. Careful consideration of Judge Smith's ruling on BOW's motion for partial summary judgment, and of the complaints in the TEC litigation, has persuaded us, however, that this predicate for a finding of waiver cannot be sustained. In ruling on BOW's motion for partial summary judgment, Judge Smith rejected unequivocally, as a matter of law, VNB's contention that monies paid in settlement of *claims* sounding in fraudulent or other

intentional misconduct fell outside the reach of the Participation Agreement. Under the Judge's ruling, VNB *is* liable for 50% of the expenses BOW incurred in relation to the TEC loan, *regardless* of the character of the claims in the litigation in response to which the expenses were incurred. Stated differently, the law of this case is that the type or character of the wrongs alleged in the state court actions cannot serve as a basis for a conclusion that the claims are not "related to" the loan. Thus, a finding that some or all of the claims in the TEC litigation were not "related to" the loan that was covered by the Participation Agreement could not be based on how the alleged misconduct was labelled, but would have to be based on a showing that the acts that allegedly served as predicates for liability were clearly disconnected from the lending relationship to which the Participation Agreement relates.

VNB has presented to the undersigned what apparently are representative complaints in the TEC litigation. In my view, it is the providing of the financing reflected in the Participation Agreement that most centrally underlies the claims to which BOW was compelled to respond in the TEC litigation. The core of the allegations by the state court plaintiffs is that BOW provided important financial support to TEC knowing that the transactions it was funding involved properties and business opportunities whose value had been vastly and intentionally inflated in order to perpetuate an appearance of profitability and, with that, to continue to attract funds from unsuspecting investors with whose money TEC was pursuing large profits (for itself) by taking unconscionable risks. The state court plaintiffs allege that BOW was motivated to participate in the fraudulent scheme at least in part by a promise by TEC officials to direct a constant flow of banking business from TEC's investor pool, including IRA and Keogh accounts. The primary predicate for the claims against BOW was not how it handled the business that was directed to it, however, but the provision of the underlying financing itself. Without that financing, the fraudulent schemes attributed to TEC would not have

been possible. Moreover, it appears that the huge losses for which plaintiffs sought damages in those actions did not arise primarily out of the fate of IRA and Keogh accounts, or out of any other banking business or service provided directly to plaintiffs by BOW, but out of the failure of the underlying investments which TEC orchestrated with BOW loans.

Against this background, we believe that a reasonable implication of Judge Smith's Order Granting Partial Summary Judgment is that when this matter goes to trial BOW will be able to make a prima facie case under its contract without adducing evidence that proves that none of the potential predicates for BOW's liability in the state court actions was unrelated to the financing covered by the Participation Agreement. Rather, given the obvious centrality of that financing to the claims against BOW, it appears that BOW will be able to make its prima facie case on the basis of relatively straightforward evidence consisting for the most part of documents already produced (and in many cases matters of public record). Under Judge Smith's Order, it will only be after BOW makes a record sufficient to support an inference that the claims for which it paid settlement monies, and in defense of which it incurred attorneys' fees, were related to the financing that was the subject of the Participation Agreement, that issues about whether some of the monies were paid in order to defend against or buy peace from claims unrelated to the financing will arise. Moreover, given the structure of the Participation Agreement and the nature of the underlying state court actions, the burden will be on VNB, as part of the prosecution of its counterclaims under Paragraph 5 of the Agreement, to prove that some of the monies paid cannot be attributed to claims that "related to" the provision of the financing in which it participated. See, e.g., pages 5–6 of Judge Smith's Order, wherein she ackno VNB's contentions that claims against BOW in the TEC litigation "arose out of BOW's other financial dealings with TEC" and that BOW "concealed adverse information from [VNB] regarding TEC's

financial difficulties," but goes on to imply that such matters become relevant only in connection with VNB's counterclaims. It follows that BOW will not be the party that will first put into dispute issues about the relation between monies paid and the financing. Thus we cannot say that by pressing its contractually based claim for reimbursement, BOW is forcing the resolution of factual questions that cannot be addressed fairly without access to the Buchalter documents. For that reason, the present posture of this case is far different from the posture of cases cited by VNB in which a party assumes burdens of proof and voluntarily interjects issues whose favorable resolution is essential to that party's recovery. See, e.g., *Wilson v. Superior Court*, 63 Cal.App.3d 825, 134 Cal.Rptr. 130 (3rd Dist.1976).

### Disclosure of Privileged Communications

■ As yet another, independent ground for its argument that there has been a waiver of privilege, VNB contends that BOW and its attorneys have disclosed a significant part of their otherwise privileged communications about the TEC litigation. Under section 912 of the California Evidence Code, a party waives the attorney-client privilege if it "has disclosed a significant part of the communication or has consented to such disclosure made by anyone." BOW does not dispute VNB's contention that California law compels a finding of waiver with respect to all otherwise privileged communications on a single subject if the evidence shows that a significant part of the privileged communications has been disclosed. Instead, BOW insists that some of the material it disclosed to VNB was not covered by the privilege at all, that the disclosures that arguably were covered by the privilege were limited in character, compelled by the terms of the Participation Agreement, and did not constitute a "significant" part of the communications between BOW and its counsel to which the protection of the attorney-client privilege extends.

The issue we confront at this juncture is: does the evidence show that BOW has dis-

closed a significant part of its privileged communications with counsel related to the TEC litigation, such that BOW compromised substantially the confidentiality of its and its counsel's thinking about how to assess, handle, and dispose of the TEC litigation, or to the point where it would be unfair to permit BOW to maintain the confidentiality of the other communications it had with its counsel on this subject? Having considered this matter carefully, we conclude that the evidence supports a finding that the disclosures of privileged information made by BOW and its counsel to VNB and its counsel were "significant" within the meaning of section 912 of the California Evidence Code and that BOW has waived the protections otherwise afforded by the attorney-client privilege to other communications related to the handling and disposition of the TEC litigation. After describing the evidence that supports this finding, we respond to BOW's argument that the disclosures it made were "reasonably necessary to accomplish the purpose for which Buchalter was consulted by plaintiff" and, as such, cannot form the basis for a finding of waiver.

VNB has submitted substantial evidence about disclosures by BOW. Some of the disclosures were of communications that could not have been protected by the attorney-client privilege; such disclosures cannot contribute to a finding of waiver. Thus, in making our finding on the waiver issue, we ignore the demand letter from counsel for plaintiffs in the TEC litigation to counsel for BOW (a demand letter from one party to its adversary in litigation is not a confidential communication between a client and its lawyer) and the copy of the settlement agreement between BOW and plaintiffs in the TEC action (that settlement agreement, by its own terms, contemplated public disclosure as part of the process of securing a good faith determination by the state court; moreover, it was a communication across hostile party lines, not a private communication between a lawyer and his client). In making our finding on the waiver issue we also ignore communication of matters already of public

record at the time the communication occurred, e.g., communications about what claims or defenses were set forth in pleadings on file, what rulings the court had entered in response to motions, or what dates had been fixed for upcoming events in the litigation.

Even when we ignore communications of the kinds just described, however, the evidence supports a finding that BOW and its counsel made substantial disclosures to VNB of matter that otherwise would be entitled to protection by the attorney-client privilege. Richard Segal, outside counsel to VNB, has submitted a declaration in which he describes disclosures made by counsel for BOW at two meetings that he and a representative of his client attended. Mr. Segal's portrayal of what was disclosed in the first meeting is not very specific and, standing alone, would be of little consequence. He states that on February 16, 1987, counsel for BOW "briefed us on the status of the TEC actions, and spoke of representations that he wished to make to the Court on VNB's behalf." (Segal Decl., executed July 12, 1990). Since it is not clear that these disclosures embraced anything beyond matters of public record or matters intended to be made public, this evidence, by itself, does not contribute meaningfully to a finding on the waiver issue. It acquires some (modest) added significance, however, in light of the declaration submitted by Wallace Turnage, Vice President of VNB, who also was present at the February 16 meeting. Mr. Turnage states that during this meeting, in addition to describing the theories set forth in the complaints by the TEC plaintiffs and noting when hearings would be held on motions, counsel for BOW "said that Ernest De La Ossa, a director of both BOW and TEC, was heavily involved in TEC." (Turnage Decl., executed July 12, 1990). While we do not ascribe great significance to this one disclosure, standing alone, we note that it does not appear to reflect only matters of

public record, that it may imply an opinion with legal implications, and that it is the kind of statement one would expect to be covered by the attorney-client privilege if made to a client in confidence.

The communications that Mr. Segal and Mr. Turnage ascribe to counsel for BOW at a meeting on March 23, 1988, are much more significant for present purposes. Mr. Segal states that on that occasion counsel for BOW *"told us his views of the [TEC] litigation, including his strategies for the case and his analysis of the strengths and weaknesses of the case.* He discussed the motions for summary judgment filed by both sides and his thoughts about the judge's rulings." (Segal Decl., executed July 12, 1990, emphasis added).[1] Describing the same meeting, Mr. Turnage adds that counsel for BOW *"discussed possible settlements of the case, including his guesses concerning plaintiffs' settlement figure and what kind of deal the banks might be able to get."* (Turnage Decl., executed July 12, 1990, at 6–7, emphasis added). BOW has not submitted any declarations that tend to undermine the accuracy of these characterizations of the disclosures made at this meeting. In fact, BOW has offered no challenge whatsoever to the Segal declaration. And the only attack on the Turnage declaration consists of quotations from his deposition which suggest, generally, that he had not received information from BOW about some aspects of the TEC litigation; Mr. Turnage was not asked in these passages, however, about the March 13 meeting. On this record, we are constrained to find that the evidence shows that the communications described by Mr. Segal and Mr. Turnage were made. These communications clearly are the kind that would have been covered by the attorney-client privilege (if made in confidence to a client) and are in the center of the subject matter with respect to which BOW

---

1. Mr. Segal's declaration does not mention an additional, significant conversation he had with counsel for BOW. That conversation is the subject of a letter dated October 17, 1988, from Peter Bertrand of the Buchalter firm to Mr. Segal. Exhibit 1 to the Shearman Decl., exe-

cuted July 13, 1990. This letter, which we describe *infra* in the text, indicates that Mr. Bertrand had shared with Mr. Segal in considerable detail his thoughts about the pros and cons of a proposed settlement with several of the defendants in the BOW suit against Main Hurdman.

is trying to preserve the confidentiality of other communications.

Mr. Turnage's declaration includes additional factual assertions that help support, in varying degrees, VNB's contention that BOW and its counsel disclosed a "significant part" of its privileged communications about the TEC litigation. Mr. Turnage states that he spoke with counsel for BOW about the TEC litigation on several occasions and that during these conversations "the attorneys for BOW communicated many items of confidential information concerning the TEC Litigation to me, including their strategies and assessments of the case." (Turnage Decl., executed July 12, 1990, at 2). In addition to the meetings of February 16, 1987, and March 23, 1988, discussed above, Mr. Turnage reports the following: at a meeting on November 13, 1986, counsel for BOW "summarized the status of the lawsuits against BOW," (Turnage Decl., at 2)[2]; in conversations on February 11, 1987, counsel for BOW "told me that there was a possibility that TEC's officers and directors and its law firm, Kouns Marshall might settle out of the case. The defendant group was not agreeable to the proposed settlement because it would bar them from asserting claims against the directors. They said that if VNB had some insurance coverage BOW and VNB might be able to settle," (Id., at 3); on March 20, 1987, counsel for BOW "stated that he felt that he represented the participation and that he was worried about a possible conflict in connection with VNB's refusal to pay part the part [sic] of the Buchalter legal bill related to the IRA accounts," (Id., at 4); on June 29, 1987, counsel for BOW "said that the various actions filed against Main Hurdman would probably not settle without first trying some cases due to the aggregate size of the claims" and that "the McLaughlin action would probably be the messiest because

the plaintiff was a 70 year old woman;" in the same conversations Mr. Turnage and his lawyer discussed with counsel for BOW "whether the banks should sue the TEC directors. They [counsel for BOW] said that the banks could sue Harry Stern and Herb Barovsky of TEC and sign a tolling agreement with the other TEC directors to preserve the banks' rights. The directors and officers would settle after the good faith hearing and then the banks could pursue a claim against the insurance proceeds.... On the suit against Main Hurdman they said ... they would add Stern, Barovsky, Foster and several Does as defendants. They said that they would also add the law firm of Kouns Marshall as a defendant.... By naming TEC's officers and directors, they said, we would be able to tap their insurance pool. They said that they would enter into a tolling agreement with Security Pacific, Sutro and Bear Stearns to preserve the banks' claims against them.... They told us.... No one was yet aware of VNB's role.... They told me that Buchalter had met with the other firms to share information and jointly retain Price Waterhouse. They discussed the several tracks for depositions and discovery." (Id., at 4–6).

In further support of Mr. Turnage's account of conversations with counsel for BOW, VNB has submitted hand-written notes Mr. Turnage made of a telephone conversation he had with Ken Kennedy, one of the lead outside counsel for BOW. (Exhibit 9 to Martinez Decl., filed October 25, 1989). It appears from references to procedural events in these notes that this conversation occurred in March of 1987. The notes suggest that Mr. Kennedy and Mr. Turnage had a lengthy conversation that covered a wide range of matters related to the status of the TEC litigation and the financing of BOW's defense. Mr. Ken-

---

**2.** Standing alone, this characterization is not sufficient to support an inference that BOW shared what would otherwise be privileged communications with Mr. Turnage and his lawyer on this occasion. As we discuss later in the text, however, this one line characterization by Mr. Turnage does not stand alone. Rather, it is amplified, significantly, by information in a

document from *BOW's* files. That document consists of hand written notes in which William L. Zillman, BOW's general counsel, states that he made "two trips to SJ to *discuss all aspects of case* (November 1986, June 1987)." Exhibit A to Shearman Decl., executed July 19, 1990, emphasis added.

nedy reported on several procedural matters (hearing dates, discovery plans, deadlines for amendments to pleadings, etc.) and offered an opinion about how the bank defendants were faring during hearings on demurrers. He also appears to have discussed some tactical matters; e.g., the notes refer to trying "to get a consolidated complaint," to BOW's decision not to add certain defendants to its suit against Main Hurdman "at this time," and (unclearly) to the prospects for "partial settlement" and amounts in defendants' insurance policies.

Hand written notes by William Zillman, BOW's general counsel, lend additional support to the characterization of communications from BOW that are offered in the declarations submitted by Mr. Turnage and Mr. Segal. These notes, dated December 22, 1987, capture portions of a telephone conversation with Mr. Turnage and offer comments on some of his statements. Reacting (to himself) to Mr. Turnage's complaint that VNB was "Not informed of 'what's going on,'" Mr. Zillman wrote: "Note: Don't understand their position that they haven't been informed; had update in June; have had copies of bills. They maintain they've never seen complaints, never received updates. Absolute nonsense; participated in discussions—made two trips to SJ to *discuss all aspects of case* (November 1986, June 1987); conference call with VNB counsel (and litigators March 20, 198 [last digit illegible, very likely 1987]; *full update* June 29, 1987." (Zillman notes, emphasis added, Exhibit A to Shearman Decl., executed July 19, 1990).

The complaint about not being kept abreast of developments that is attributed by Mr. Zillman to Mr. Turnage is consistent with the allegation in paragraph 116 of VNB's First Amended Counter-claim that BOW was "grossly negligent in failing to inform [VNB] about the true facts, progress and risks of the TEC litigation, in particular ... the Calliope Report and the Anderson Memo at the very outset of the TEC Litigation and the risks [BOW] faced in the TEC Litigation because of those studies." While at first glance there would appear to be some tension between these complaints by VNB and its contention (in

this motion) that BOW disclosed significant parts of its privileged communications, on closer examination we find no necessary inconsistency. BOW could have provided VNB with briefings about the TEC litigation that were untimely and unreliable, while at the same time disclosing significant parts of its otherwise privileged (and possibly shallow) thoughts about how to analyze, handle, and dispose of that litigation.

VNB has directed the court's attention to five additional documents that arguably contain communications that otherwise would qualify for protection by the attorney-client privilege but that have been shared by BOW with VNB. The first of these is a Memorandum from Gary Nemer of the Buchalter firm to William E. Sinn of BOW. In this memorandum, dated May 20, 1986, Mr. Nemer describes the law and analyzes the state of the evidence that could support claims by BOW against TEC's accountant, Main Hurdman. Mr. Nemer then presents a series of case-development options for BOW to consider. (Exhibit 6 to Martinez Decl.). This five-plus page document represents classic attorney-client material.

The document next in chronological order is a letter that Ken Kennedy, then with the Buchalter firm, sent simultaneously on November 19, 1986, to officers of BOW, VNB, and Pacific Valley Bank. Mr. Kennedy attaches to his letter a "recent draft" of a complaint his firm has proposed filing against Main Hurdman. In the body of the letter, Mr. Kennedy notes that his firm is still gathering information that will be used to determine whether to name additional defendants in the proposed suit. He also reports that he hopes soon to have "additional information regarding the status of proposed settlement arrangements with GECC," information that he hopes will "either remove them as a party or eliminate any obstacles to their being joined as a party.... In this regard [he adds] and since our respective meetings, I have given additional thought to the possibility of direct action against GECC for recovery of amounts expended under a control and do-

minion theory in addition to whatever exposure they may face for indemnification." Finally, Mr. Kennedy explains why he has not included in the complaint at this time the indemnity claims that the banks will be able to assert. These also are kinds of communications which, if made in confidence to a client, would be privileged.

The third document in this group is another letter over Mr. Kennedy's signature, this one dated February 5, 1987, and addressed only to Mr. Zillman of BOW but copied to Mr. Turnage of VNB, his counsel, Mr. Gust, an officer of Pacific Valley Bank and another person. (Exhibit 8 to the Martinez Declaration). Here Mr. Kennedy appears to be responding to concerns Mr. Zillman (and perhaps others) had expressed about the costs of conducting the litigation. Mr. Kennedy offers reassurances and describes steps he is taking to contain those costs. The matters discussed here clearly could be covered by privilege, but their disclosure, standing alone, is not especially significant for present analytical purposes (because they do not relate to substantive issues, litigation strategy, or settlement).

The last of the letters that is in this group of documents was sent October 17, 1988, by Peter Bertrand of the Buchalter firm to Richard Segal, outside counsel for VNB. Prefaced by the phrase *"PRIVILEGED AND CONFIDENTIAL,"* and captioned "Re: *Technical Equities Litigation,*" this letter is self-described as a "recap of our recent discussion regarding pending settlements." Mr. Bertrand notes that since he and Mr. Segal already have discussed these matters *"at length"*, he will not attempt here to "articulate each of the elements of the settlement or all of the pros and cons, since you indicated *you took copious notes which you would discuss with Valley National Bank."* (emphasis added). Nonetheless, Mr. Bertrand proceeds to set forth in some detail his views about the wisdom of settling, on specified proposed terms, with the lawyer defendants in the Main Hurdman action. He also discusses possible settlements with the "insider officer defendants" and with Sutro & Company, noting along the way various legal, evidentiary, and practical obstacles

to more fulsome recoveries against these defendants. Like several of the other communications described in the preceding paragraphs, this would be classic privileged material if it were communicated in the appropriate setting.

The final set of documents that VNB has presented in connection with this part of its motion consists of billing records generated by the Buchalter firm in connection with the TEC litigation. (Exhibit 12 to the Martinez Decl.) These records show how much time Buchalter lawyers spent on various litigation tasks, the descriptions of which are typically rather summary. The disclosure of these billing records lends relatively little, if any, support to VNB's waiver argument, in part because they do not "communicate" much of a substantive or tactical character, and in part because it is so clear that BOW would be required to share this kind of material with VNB to justify its demand that VNB reimburse it for half of the two million dollars in attorneys' fees and costs that the Buchalter firm managed to bill in connection with the TEC litigation.

The court has described the evidence on this issue in detail in order to make it clear that BOW's disclosures of otherwise privileged matter relating to how to analyze, handle, and settle the TEC litigation were quite substantial. These disclosures go to the heart of matters that one generally would expect to be covered by the privilege. They clearly represent a "significant" part of the communications that BOW otherwise would have been entitled to protect. The pattern of selective disclosures of significant portions of confidential material that is evident in this record is fundamentally at odds with basic notions of fairness: to permit BOW to choose which of its communications in this subject area it will share with VNB would create an intolerable risk that communications helpful to BOW would be disclosed while communications helpful to VNB would remain hidden.

### Section 912(d) of the California Evidence Code

BOW argues that even if it disclosed a significant part of its otherwise privileged

communications, paragraph (d) of section 912 of the California Evidence Code prevents that disclosure from effecting a waiver. The relevant portions of that paragraph state: "A disclosure in confidence of a communication that is protected by a privilege ... when such disclosure is reasonably necessary for the accomplishment of the purpose for which the lawyer ... was consulted, is not a waiver of the privilege."

BOW suggests two predicates for its contention that the communications described above fall within the reach of this statutory exception. The first is the opinion from a California court of appeal in *Cooke v. Superior Court of Los Angeles*, 83 Cal.App.3d 582, 147 Cal.Rptr. 915 (2d Dist.1978). According to that opinion, "[t]he law is that privilege extends to communications which are intended to be confidential, if they are made to attorneys, to family members, business associates, or agents of the party or his attorneys on matters of joint concern, when disclosure of the communication is reasonably necessary to further the interests of the litigant." Somewhat ·more specifically, the *Cooke* court stated that the privilege could extend to communications with "business associates who were legitimately kept informed of the progress of a lawsuit that directly involved the business with which they were associated." *Id.*, at 588, 147 Cal.Rptr. 915. We note first that it is not clear how far the *Cooke* court intended the phrase "business associate" to reach in this context; we suspect that it covers people who are employed by or who have a direct financial interest in the company or enterprise that has retained the lawyer or on whose behalf the lawyer is working. The one situation that it seems clear the *Cooke* court had in mind arises when an attorney is representing a business in litigation and the person with whom the privileged communication is shared is associated with the business that the lawyer is representing. We do not think that the *Cooke* court would consider VNB a "business associate" of BOW's under the facts of the case at bar. There was no one "business" (company, entity, or enterprise) in which BOW and VNB were "associates." Rather, they were two quite separate business entities, each assertively represented by its own separate lawyer. What they had in common was their participation in a loan transaction. As a result of that transaction, only one of them, BOW, had been sued. Moreover, while both businesses shared some interests in common with respect to the loan transaction and the TEC lawsuits (each wanted to get its money back and neither wanted BOW to suffer an adverse judgment), they also had interests, with respect to the litigation, which were quite antagonistic.

Next, we observe that the *Cooke* court did not purport to interpret the statute on which BOW relies; that court did not cite or discuss section 912 of the Evidence Code and did not mention the concept of waiver. Instead, the court focused on sections 952 and 917 of the Evidence Code, which define "confidential communications between client and lawyer" (section 952) and identify the circumstances under which a presumption of confidentiality arises (section 917). Section 952, however, contains language that roughly parallels language in paragraph (d) of section 912. The key concept in both sections of the Code is that privilege is not vitiated when the holder of the privilege shows that it had to make the disclosures to the third persons *in order to accomplish the purpose for which the client retained the lawyer.* In our case, BOW had retained the Buchalter firm for the purpose of defending BOW in the TEC litigation. It was conduct by BOW that was in issue in the TEC litigation, not conduct by VNB. Since VNB had not had an active relationship with TEC, and since no conduct by VNB was in issue in the TEC litigation, it simply cannot be said that BOW's lawyers had any need to share substantial information with or acquire substantial information from VNB in order to defend BOW in the pending suits. The Buchalter lawyers certainly could have represented BOW in the TEC litigation quite well without sharing their legal analyses, tactical plans and settlement strategies with VNB and its counsel.

The second predicate that BOW advances in support of its contention that section 912(d) prevents a finding of waiver is that BOW was required, under the terms of the Participation Agreement, to make the disclosures described earlier in this section.[3] BOW points to two provisions in that Agreement in support of this position. The first, in paragraph 6, states: "Whenever practicable Lender shall advise Participant of all anticipated Extraordinary Expenses prior to incurring the same." The second provision on which BOW relies states, in paragraph 7: "Lender shall not, without Participant's written consent, modify, amend or supplement the arrangement with the Borrower, or release, waive, or discharge the Borrower or any Collateral except as contemplated in the Loan Documentation." (BOW's Supplemental Memorandum, at 3, filed July 13, 1990).

We do not understand how either of these provisions could be construed as requiring BOW to share *privileged* litigation strategies and analyses. Disclosures of the kind described earlier in this section were not necessary in order to give VNB timely notice of the amounts of anticipated extraordinary expenses. And the second provision on which BOW relies simply declares that BOW may not change its lending arrangement with TEC or relieve TEC of its obligations as a borrower without VNB's written consent. For purposes of analyzing the waiver issue, among the most important disclosures that Buchalter made to VNB consisted of strategies and analyses with respect to claims pressed by plaintiffs in the TEC litigation against BOW and TEC, as well as thoughts about terms on which settlements might be reached with a wide range of plaintiffs and defendants, only a small fraction of whom were even connected with TEC. It is not at all clear how a requirement to secure VNB's written consent before changing a *lending relationship with TEC* could be construed as requiring disclosure of confidential information about how to handle suits in which TEC was not aligned against BOW or settlements with parties other than TEC. Precious few, if any, of the disclosures on which our waiver ruling relies involved even potential claims by BOW against TEC itself[4] or possible release by BOW of any obligation arising out of the lending relationship that TEC owed BOW or VNB.

Thus we conclude that the vast majority of the disclosures in issue here were not required by the provisions in the Participation Agreement on which BOW is relying. Since most of the disclosures were not even arguably required by the contract, we must reject the argument that the contract made the disclosures "reasonably necessary for the accomplishment of the purpose for which the lawyer ... was consulted...." Cal.Ev.Code section 912(d).

In sum, none of the reasons advanced by BOW persuade us that paragraph (d) of section 912 of the California Evidence Code prevents reliance on the disclosures described at length earlier in this section for a finding of waiver. Given our view that the disclosures were voluntary and constituted a significant part of what would otherwise have been privileged communications, we hold that BOW has waived the protections of the attorney-client privilege with respect to communications about how to analyze, handle, and dispose of (by settlement or otherwise) the TEC litigations.

### Work Product Protection

■ BOW also has asserted that many of the documents sought by VNB are protected independently by the work product doctrine. VNB has attempted to make the very demanding showing that is required by Federal Rule of Civil Procedure 26(b)(3) to justify penetration of opinion work prod-

---

3. Ironically, since we have found that the disclosures in question involved legal analyses, tactical considerations, and evaluations of settlement options, a finding that BOW had a *contractual* obligation to make these kinds of disclosures would result in a ruling that the Participation Agreement (independent of any waiver under California statutes) imposes a duty on BOW to disclose the Buchalter documents that it is trying to protect here.

4. Among the many disclosures described in the text, a few (but certainly not the majority) related to possible claims by the banks against insider officers or directors of TEC.

uct.[5] We need not pass judgment on whether VNB has met this burden, however, because we find that BOW also has waived whatever protections the work product doctrine might otherwise have afforded the Buchalter documents.

We acknowledge, at the outset, that the "work product doctrine is an independent source of immunity from discovery, separate and distinct from the attorney-client privilege" and that "waiver of the attorney-client privilege does not necessarily mean that the protection afforded by the work product doctrine is also breached." *Handgards, Inc. v. Johnson & Johnson*, 413 F.Supp 926, 929 (N.D.Cal.1976). Because different policies inspire the protections afforded by these two distinct doctrines, analysis of waiver issues under the one does not necessarily carry over to analysis of waiver issues under the other. *Id.*, at 929–30.

Because a core function of the work product doctrine is to prevent *a current or potential adversary in litigation* from gaining access to the fruits of counsels' investigative and analytical work, as well as their strategies for developing or presenting their client's case, analysis of waiver issues with respect to this doctrine focuses primarily on whether the disclosures in issue appreciably increased the likelihood that a current or potential opponent in litigation would gain access to the disputed documents. See, e.g., Wright & Miller, 8 Fed.Practice and Procedure, Civil, § 2024 (1970, with 1990 Pocket Part). At the time BOW made the disclosures described in the preceding section, VNB was not its adversary in litigation. There can be little doubt, however, that BOW understood that litigation between it and VNB was a very real possibility. From even before TEC went into bankruptcy VNB retained and was represented by its own separate counsel. See, e.g., Exhibit A to Kennedy Decl., filed July 20, 1990. That separate counsel participated with VNB in most of the meetings and conversations in which the TEC litigation was discussed with representatives of BOW. (Turnage Decl., executed July 12, 1990, at 2). Moreover, the counsel that worked with VNB with respect to the TEC situation prior to the filing of the instant action included not only a business lawyer, but also a litigator. In early 1987, before many of the disclosures described in the preceding section were made, Mr. Zillman of BOW (with Ken Kennedy of the Buchalter firm) participated in a telephone conference call with Mr. Turnage and two lawyers representing VNB. During that conversation Richard Segal, who was introduced to Mr. Zillman as one of the "litigation partners" in the firm that represented VNB, "expressly stated that the Buchalter firm did not represent Valley National in connection with the TEC Litigation." (Zillman Decl., at 2, filed July 20, 1990).

Given the allegations by the state court plaintiffs that ˙*BOW* had worked self-consciously with the TEC defendants over a substantial period of time to plan and execute a massive fraud, and *had used funds provided by VNB to carry out this unlawful activity*, and given the obvious reluctance VNB was showing to contribute to any of BOW's defense costs (at some point. Buchalter stopped sending bills to VNB because they were simply being ignored), as well as the clearly self-protective steps VNB was taking by retaining its own lawyer and distancing itself from BOW's counsel, it had to have been clear, at the time the communications in issue here were made, that litigation between BOW and VNB related to the TEC debacle was a very distinct possibility. Given that fact, we hold that by making the disclosures described in the preceding section, many of which involved matter that otherwise would fall within the protections of the work product doctrine, BOW has waived those protections with respect to the remaining Buchalter documents.

**5.** As the Supreme Court made clear in *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), such material is entitled to "special protection" and may be ordered disclosed, absent waiver, only on a showing that is "far stronger" than the "substantial need" and "undue hardship" that are required by Rule 26(b)(3) in order to penetrate the protection that is afforded non-opinion work product.

Given this holding, we need not reach VNB's additional argument that BOW has placed in issue the reasonableness of the fees it incurred in connection with the TEC litigation and that fairness requires the disclosure of the Buchalter documents in order for VNB (and the trier of fact) to ascertain whether the charges for the work done by the Buchalter firm were justified.

### Conclusion

Because we have concluded that BOW has waived the protections of both the attorney-client privilege and the work product doctrine with respect to the Buchalter documents, we hereby ORDER BOW to produce those documents to counsel for VNB by August 31, 1990.

IT IS SO ORDERED.